USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/23/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PATRICE GALLO, on behalf of M.G.,

          Plaintiff,

-against-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

          Defendant.

---

15-CV-9302 (AT) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. ANALISA TORRES**

**BARBARA MOSES, United States Magistrate Judge.**

Pro se plaintiff Patrice Gallo filed this action on behalf of her minor son, M.G., seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income (SSI). The Commissioner moves, pursuant to Fed. R. Civ. P. 12(c), for an order remanding the case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). (Dkt. No. 19.) In letters dated August 10, 2016 (Dkt. No. 21) and September 2, 2016 (Dkt. No. 23), Gallo opposed the motion to remand. For the reasons set forth below, I respectfully recommend that the Commissioner's motion be GRANTED and the case be remanded for a new hearing.

## I.  BACKGROUND

### A.  Procedural Background

On June 20, 2012, Gallo filed an application for childhood disability benefits on behalf of her son, M.G., alleging that he became disabled on January 1, 2009. *See* Cert. Tr. of Record of Proceedings (Dkt. No. 15) 44, 103 (hereinafter "R. __"). On December 11, 2012, the application was denied. (R. 45.) Thereafter, Gallo requested a hearing before an Administrative Law Judge (ALJ), and on February 4, 2014, she appeared, without counsel, before ALJ Patrick Kilgannon. (R. 29.) Dr. James Bruce Burnett, a medical expert in the field of pediatrics, appeared and testified by telephone. There were no other witnesses. The hearing lasted eighteen minutes. (R. 31, 43.) On

February 7, 2014, ALJ Kilgannon asked Dr. Burnett to respond to written interrogatories concerning M.G. (R. 199), and on February 26, 2014, Dr. Burnett submitted his answers. (R. 224.) There is no indication in the record that Gallo saw either the questions or the answers.

On May 28, 2014, the ALJ issued a decision (R. 10) finding that M.G. was not disabled within the meaning of the Social Security Act, 42 U.S.C. § 1381, *et seq.* (the Act). The decision became final on September 23, 2015, when the Appeals Council denied plaintiff's request for review. (R. 1.) This action followed.

### B.    Relevant Medical and Educational Background

M.G. was born on May 26, 2005. (R. 44.) According to his mother, M.G. began to exhibit hyperactive behavior at the age of three. (R. 171.) When the boy was six years old, he began treatment with Dr. Saidi Clemente, the Division Chief of Developmental/Behavioral Pediatrics at Staten Island University Hospital (SIUH). (R. 178, 196.) Dr. Clemente first examined M.G. on April 5, 2012, noting that he was "observant" and "had good eye contact," but "was kind of oppositional and uninterested." (R. 180.) "His level of cooperation was low and he refused to participate" in various tasks. *Id.* Dr. Clemente attempted to administer an Einstein Assessment of School Related Skills (first grade level), but could not complete the assessment because of M.G.'s lack of cooperation. *Id.*

According to Dr. Clemente's notes from the April 5, 2012 appointment, M.G. was forgetful, needed frequent redirection, and had trouble paying attention. (R. 179.) He was in a general education first grade class, but his teachers reported that he "zone[d] out" and required a lot of redirection. *Id.* Dr. Clemente reviewed both the parent and teacher versions of the Early Childhood Inventory Fourth Edition behavioral checklist, which had been filled out by Gallo and by one of M.G.'s teachers before the appointment. (R. 180.) Neither version of the checklist

appears in the record. Based on his review of the checklists, Dr. Clemente noted that M.G.'s mother and teacher both "endorsed enough behaviors for ADHD combined." *Id.*

Dr. Clemente diagnosed M.G. with ADHD and Learning Disorder not otherwise specified (NOS). (R. 180.) Dr. Clemente discussed M.G.'s diagnoses and treatment options with Gallo, and recommended medication therapy. *Id.* Gallo requested an opportunity to conduct her own research before agreeing to medication therapy. *Id.* Dr. Clemente also wrote that he would refer M.G. for neuropsychological testing to assess his cognitive function and academic skills in more detail. *Id.* It is unclear from the record whether this occurred.

On July 11, 2012, after Gallo applied for SSI benefits on M.G.'s behalf, she filled out a "Function Report" in which she identified various limitations in M.G.'s ability to communicate, to progress in learning, and to perform certain physical tasks. (R. 90-101.)[1] On the Function Report, Gallo stated that M.G.'s impairment affected his behavior with other people, his ability to help himself and cooperate with others in taking care of personal needs, and his ability to pay attention and stick to a task. (R. 93-98.)

On October 16, 2012, special education teacher Christina Abate and general education teacher Victoria Serecin jointly completed a "Teacher Questionnaire" regarding M.G. (R. 108.) By this point the child was in second grade, in an integrated co-teaching (ICT) classroom with two teachers, 28 children, and a paraprofessional who sat at M.G.'s table. (R. 108, 109.)[2] Abate saw M.G. every school day for instruction in reading, writing, math, science, and social studies. (R.

---

[1] The first page of the Function Report is dated July 11, 2010, which is likely a typographical error. (R. 90.) A related document in the agency file is dated July 11, 2012. (R. 101.)

[2] According to the New York City Department of Education, ICT "ensures that children with disabilities are educated alongside age-appropriate peers in a general education setting. ICT classes consist of one general education teacher and one special education teacher, providing a reduced student/teacher ratio." N.Y.C. Dep't of Educ., Glossary of Terms, *available at* schools.nyc.gov/NR/rdonlyres/.../Glossary_of_Terms_NYC_DOE_2015_ACS.pdf.

108.) She reported that although M.G. was in second grade, his "current instructional level" was "1st grade" in reading, "approaching 2nd" grade in math, and "1st grade" in written language. *Id.*

As part of the questionnaire, the teachers assessed M.G.'s capabilities in six functional domains:

1.  Acquiring and using information;
2.  Attending and completing tasks;
3.  Interacting and relating with others;
4.  Moving about and manipulating objects;
5.  Caring for oneself; and
6.  Medical conditions and medications/health and physical well-being.

(R. 109-14.) The teachers were asked to rate M.G.'s capabilities on a scale of 1 to 5, where 1 meant "no problem," 2 meant a "slight problem," 3 meant an "obvious problem," 4 meant a "serious problem," and 5 meant a "very serious problem."

The teachers found that M.G. had a variety of problems, ranging from "slight" to "very serious," in the first two domains: (1) acquiring and using information and (2) attending and completing tasks. (R. 109-110.) For example, within the first domain M.G. had an "obvious problem" understanding school and content vocabulary, comprehending and doing math problems, and expressing ideas in written form. Within the second domain M.G. had a "serious problem" focusing long enough to finish an assigned activity or task and refocusing to task when necessary, and a "very serious problem" organizing his own things or school materials and working at a reasonable pace/finishing on time. (R. 109-10.) With respect to the other four domains, the teachers reported "no problems." (R. 111-14.) Overall, the teachers described M.G. as "very unorganized" and "easily distractable [sic]," and said he had "a hard time staying focused." (R. 115.)

On October 19, 2012, consultative examiner Richard King, M.D., whose qualifications do not appear in the record, conducted a pediatric examination of M.G. (R. 171.) Dr. King noted that M.G. had a history of hyperactivity, had problems as early as preschool, and was "constantly in

motion . . . on the floor rolling around, not sitting still in class. This is also true at home." (R. 172.) M.G. had "occasional contact with friends" and "plays video games," but "there are problems because of his hyperactivity." *Id*. Dr. King noted that M.G. was receiving "structured classes" and that special education was "being considered." *Id*. He also noted that M.G. had taken Adderall, a medication used to treat ADHD, but the therapy had "not been successful." (R. 171.)

On examination, Dr. King observed that M.G. was in "acute distress," "does not sit still," and was in "constant motion." (R. 172.) His speech was "superficially coherent and relevant," but M.G. tended "not to give a very good history," and "frequently shrugs in response to questions." *Id*. M.G.'s intellectual functioning was "beneath chronological age" and he was unable to participate in intellectual testing during the examination. *Id*. M.G. could not spell "house," subtract 2 from 11, or "do serial 3's," and did not know the month or the year. *Id*. M.G.'s insight and judgment were also "beneath age-appropriate levels," and were marked by impulsive acting out. *Id*. Dr. King concluded that the "allegations of the claimant are consistent with the findings of the interview" and opined that M.G. demonstrated beneath age-appropriate behavior at home, school, and with peers. (R. 172-73.) He diagnosed M.G. with ADHD "with hyperactivity," "learning disorder of childhood," and "phonological disorder." (R. 172.) In the "Plan and Prognosis" section, Dr. King stated that M.G. "may benefit from psychiatric treatment and special education." (R. 173.)

On November 15, 2012, a second consultative examination was conducted by Erik Moore, Ph.D., a neuropsychologist. In an unsigned report, Dr. Moore stated that M.G. was in "a special education class in an ICP Program," but was not receiving any additional services or treatment. (R. 174.)[3] Gallo told Dr. Moore that M.G. had been prescribed a daily dose of Adderall but that

---

[3] Dr. Moore did not define the term ICP Program. He may have meant M.G.'s ICT classroom.

the drug was discontinued due to side effects including loss of appetite and weight loss. (R. 175.) Gallo also reported that M.G. had difficulty falling asleep, although it is not clear whether this was a side effect of the Adderall or an independent symptom. *Id.*

M.G.'s behavioral symptoms, as reflected in Dr. Moore's report, included "losing temper easily, being easily annoyed, and actively defying or refusing to comply with requests." (R. 175.) M.G. failed to pay attention to details, was not able to sustain attention in tasks, and failed to follow through on instructions and finish work. He was disorganized, easily distracted, and fidgety. He engaged in "out of seat behavior" at school, demonstrated "excessive motor behavior in regular settings," had difficulty waiting his turn, and acted impulsively. *Id.* Gallo also reported to Dr. Moore that M.G. experienced anxiety symptoms including a fear of "close places" and an obsession with certain objects. *Id.* M.G. needed "significant help and extended time" to do his homework. (R. 176.)

During Dr. Moore's mental status exam M.G. was "mostly cooperative," but was "relating poorly" and unable to sit still. The child was "moving around, manipulating objects, opening and closing the door." (R. 175.) There was no evidence of hallucinations, delusions, or paranoia, but M.G.'s affect was anxious and tense and his mood was dysthymic (depressed). *Id.* M.G.'s attention and concentration were "somewhat deficient" and although he was able to count and perform "simple calculations" he was "unable to complete serial ones." (R. 176.) M.G.'s memory "appeared to be intact" and age appropriate, and Dr. Moore estimated that his intellectual functioning was in the average range with age-appropriate insight and judgment. *Id.* However, Dr. Moore found that M.G. was unable to "attend, follow, and understand age-appropriate directions, complete age-appropriate tasks, adequately maintain appropriate social behavior, respond appropriately to changes in environment, learn in accordance to [sic] cognitive functioning, ask

questions and request assistance in an age-appropriate manner, and interact adequately" with peers or adults. *Id*. Dr. Moore concluded that the results of his examination "appear to be consistent with psychiatric problems and this may significantly interfere with his ability to function on a daily basis." *Id*. He diagnosed ADHD, combined type, and recommended that M.G. be evaluated by the Board of Education for alternative educational placement and services, individual psychological therapy, and "psychiatric intervention as needed." *Id*.

On November 23, 2012, M.G. was prescribed a daily dose of Concerta, another medication used to treat ADHD, by Sharon Curley, a certified Nurse Practitioner in the Developmental/Behavioral Pediatrics Division at SIUH. (R. 181.) On December 5, 2012, NP Curley and Dr. Clemente signed a one-paragraph letter reporting that M.G. was a patient at SIUH and had been diagnosed with ADHD and Learning Disorder NOS. (R. 178.) The letter stated that M.G. was "still struggling with focusing in school" and his "oppositional behavior has been a big problem both at home and in school." *Id*. Medication was "being tried" but "he is not stabilized yet." *Id*. The letter noted that "[w]e were unable to do even the most basic screening" with M.G. due to his "inability to comply. He is struggling academically in his present ICT setting (reg. ed. side) and it is our recommendation that he have a psycho-educational evaluation in order to for [sic] him to have an individualized IEP." *Id*.[4]

---

[4] The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (IDEA), requires school districts to provide disabled children with a "free and appropriate public education," *see Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005), including an individualized education program (IEP) for each such child. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174 (2d Cir. 2012); 20 U.S.C. § 1414(d). The IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507-08 (2d Cir. 2006) (internal quotation marks omitted). ADHD may constitute a disability under the IDEA. *See C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 831-32 (2d Cir. 2014). Where the child's disability is ADHD, the diagnosis is ordinarily established, and the IEP is ordinarily developed, based in part on psychoeducational testing and other evaluations conducted by or submitted to the

On December 10, 2012, consultant C. Anderson, whose specialty was "psychiatry," completed a Childhood Disability Evaluation Form for M.G. in connection with the Commissioner's initial disability determination. (R. 188.) Dr. Anderson found that M.G.'s ADHD was a severe impairment, but did not meet, or medically or functionally equal, the listings, because M.G.'s only "marked" limitation was in the domain of attending and completing tasks. (R. 188, 190-91.) The assessment appears to be based primarily on the report from M.G.'s teachers, although Dr. Anderson also referenced Dr. Moore's November 15, 2012 report and Dr. Clemente's April 5, 2012 evaluation (which Dr. Anderson incorrectly attributed to a "Dr. Roth"). (R. 193.) It is not clear from the record whether Dr. Anderson also reviewed Dr. King's October 19, 2012 report.

On December 11, 2012, M.G.'s application was denied. (R. 45.)

### C.      Post-Denial Evidence

In January 2013, M.G.'s school sent Gallo a "Promotion-In-Doubt" notice, informing her that M.G. might be retained in second grade for the 2013-2014 school year. (R. 208.) Enclosed with the notice was a sampling of M.G.'s school work, a letter from special education teacher Abate describing M.G.'s difficulty focusing in class, and an undated "1st Progress Report" reporting "little progress" towards most of the goals set out in his IEP. (R. 208-23.) It is not clear from the record when M.G. received his IEP, what psychoeducational testing was conducted in connection with its preparation or administration, or what progress he made after January 2013.

On March 20, 2013, NP Curley and Dr. Clemente signed another letter, addressed to "whom it may concern," stating that M.G. was being treated for ADHD at SIUH; that he was

---

child's school district. *See, e.g.*, *Z.A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 2016 WL 4766340, at *5-6 (S.D.N.Y. Sept. 13, 2016) (describing the "psychological, psychoeducational, speech and language, and occupational therapy evaluations" conducted in the course of creating IEP).

"recently transferred into a general Education class"; and that he "is on medication to help with focus, attention, impulse control and behavioral issues but is still persisting with attention deficits, hyperactivity, and extremely perseverant behavior that require [sic] constant need for redirection." (R. 194.) NP Curley and Dr. Clemente concluded, "We feel that he would benefit from the services of a 1:1 para[professional] in order to optimize his success." *Id.*

### D.      February 4, 2014 Hearing

On February 4, 2014, Gallo appeared before ALJ Kilgannon to appeal the initial denial of M.G.'s application. She appeared without counsel and without M.G. The hearing lasted 18 minutes and produced a 13-page transcript (not counting the title page and index). (R. 31-43.)

At the outset of the hearing, the ALJ explained that he would be contacting a medical expert in the field of pediatrics, and that both he and the doctor would "have some questions for you regarding [M.G.], also relating to medical treatment, education, etc." (R. 31.) The ALJ then asked Gallo if she had had an opportunity to "review the file." (R. 33.) Gallo responded, "The one that she just showed me outside? . . . No, I haven't. I mean, she showed it to me just now." *Id.* A moment later, after Gallo said that she had "quickly looked," the ALJ asked if she had any comments, objections, or "anything you want to let me know about [M.G.'s] case." *Id.* Gallo replied:

> Relating to the documents, the only thing I can say right now is that the only thing I didn't show was the – they had put him on medication also, but I took him off of it. I did research on it, and I just didn't agree with it. I can't condone it. I can't let him take that medication. So that's the only thing I didn't show you relating to the documents.

(R. 33-34.)

After admitting various reports into the record, the ALJ asked, "Any questions regarding anything today before I contact the doctor?" (R. 34.) Gallo said that she would "like to say a few things about [M.G.]. Do I get a chance to do that?" The ALJ responded, "Yes, absolutely." (R. 34.)

He then placed a phone call to Dr. Burnett, a pediatrician who had reviewed M.G.'s file but never examined him. Both Gallo and Dr. Burnett were placed under oath. (R. 36-37.) The ALJ prompted Gallo to give Dr. Burnett "a bit of detail" about M.G.'s medication. Gallo explained:

> He was struggling so severely in school that I decided to give it a try just for his education. And within two days, the side effects were so unbearable that I just – I couldn't take it. I took him off, and I will not be putting him back on any other kind of medication like that ever again.

(R. 37.) Dr. Burnett asked if Gallo was referring to Adderall. She responded, "He was on a few. He was on Adderall, and then I think they prescribed him a higher milligram or something. But I just – I just couldn't agree with it. I thought that the side effects to the medication . . . were worse than the underlying problem." (R. 38.)

Dr. Burnett then asked when M.G. was placed in special education. Gallo responded that her son was in an ICT class in first grade. In second grade, M.G. was "falling behind, and he was not making any progress." (R. 39.) The school "wanted to give him an IEP," but "didn't have enough room in the ICT class," and "ended up putting him back in a general ed class with an IEP, which made him fall even more behind." *Id.* In third grade, M.G.'s school "finally gave him a para in an ICT class with two wonderful teachers," and M.G. was "making a bit of progress," because of "the extra help that he finally received." *Id.*

ALJ Kilgannon asked Gallo if there was "anything else" that she wanted to "tell the doctor." In response, Gallo explained that she wanted to get as much help for M.G. as possible "right now," because "I don't want him to be an adult – a disabled adult on disability. I'm trying to prevent that right now." (R. 39-40.) Other than prompting Gallo to give Dr. Burnett "a bit of detail" about M.G.'s medication, the ALJ did not ask her any specific questions and did not elicit any testimony from her concerning M.G.'s history, symptoms, treatment, academic performance, or level of functioning at school or at home.

The ALJ did question Dr. Burnett, who testified that M.G.'s impairments were ADHD and a learning disorder; that in his opinion M.G.'s impairments did not meet or equal the listings because M.G. had "less than marked" or "no" limitations with respect to all domains except for attending and completing tasks (where he had "marked" limitations); and that all the findings and opinions in the record were consistent. (R. 40-42.) Dr. Burnett's testimony, from start to finish, took up three and a half pages of the transcript. *Id.* Part way through, Gallo asked, "What is he talking about?" (R. 40.) The ALJ ignored the question and asked Dr. Burnett to "proceed." (R. 41.) When Dr. Burnett completed his testimony, the ALJ asked Gallo if she had any questions or "if there is anything else you want to tell us." She responded, "I don't exactly know what [Dr. Burnett] is reading and talking about right now, just that he needs help, my son." (R. 42.) With that, the ALJ closed the hearing. (R. 43.)

On February 7, 2014, ALJ Kilgannon requested that Dr. Burnett respond to medical interrogatories. (R. 199.) Dr. Burnett did so on February 26, 2014. (R. 226.) In his interrogatory answers, Dr. Burnett opined that M.G.'s impairments were Learning Disability and ADHD; that the ADHD caused more than a minimal limitation in M.G.'s ability to function compared to other children the same age who do not have impairments; but that M.G.'s impairments failed to meet or medically equal the listings based on his evaluation of the relevant functional domains. (R. 227-29.) In evaluating the domains, Dr. Burnett found that M.G. had a "marked" limitation with respect to attending and completing tasks and a "less than marked" limitation with respect to the other five domains. (R. 230-31.) Regarding the domain of acquiring and using information, Dr. Burnett concluded that M.G.'s limitations were "less than marked" based in part on the fact that M.G. was in a "regular" education program in 2012 and in a "general" education program in 2013, and in part on M.G.'s "good response to meds." (R. 230.) Neither of these factors finds support in the

record.[5] Nor does the record contain any indication that the ALJ proffered the post-hearing interrogatories to Gallo for response.

### E.   The ALJ's Decision

In his formal written decision, ALJ Kilgannon correctly set out the three-step sequential evaluation process that must be used to determine whether a claimant under the age of 18 is disabled within the meaning of the Act. (R. 10-12.) At step one, the ALJ must consider whether the child is engaging in substantial gainful activity. 20 C.F.R. 416.972(a). If so, the child is not disabled. *Id.* If not, the ALJ must proceed to step two and consider whether the child has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. 416.924(a). If the child does not have a severe medically determinable impairment or combination of impairments, he is not disabled. *Id.*

If the child does have a severe impairment or combination of impairments, the ALJ must proceed to step three and determine whether the child's impairment or combination of impairments meets, or medically or functionally equals, the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. In making this determination, the ALJ must consider the combined effect of all medically determinable impairments, even those that are not severe. 20 C.F.R. §§ 416.923, 416.924a(b)(4), 416.926a(a), (c). If the child has an impairment or combination of impairments that meets, or medically or functionally equals the severity of, the relevant listings, and that has

---

[5] M.G. was placed in a general education setting in 2013, but – as Gallo explained during the hearing – he continued to fall behind, even though he had an IEP. Dr. Burnett also knew, but did not mention, that by early 2014 M.G. was back in an ICT class with a "para." (R. 39.) There is no indication anywhere in the record that M.G. "had a good response to meds." To the contrary: the document that Dr. Burnett cited in this portion of his interrogatory response – the March 20, 2013 letter from NP Curley and Dr. Clemente at SIUH (R. 194) – stated that M.G. "is on medication to help with focus, attention, impulse control and behavioral issues *but is still persisting with attention deficits, hyperactivity, and extremely perseverant behavior that requires constant need for redirection*." (Emphasis added.)

lasted or is expected to last for a continuous period of at least 12 months, he is presumed to be disabled. If not, the claimant is not disabled. 20 C.F.R. § 416.924(d).

To determine whether an impairment or combination of impairments functionally equals the listings, the ALJ must assess the child's functioning in the same six domains discussed above: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. In each domain, the ALJ must compare how appropriately, effectively, and independently the child performs activities compared to the performance of other children of the same age who do not have impairments. In domains (1) through (5), the Social Security regulations describe the performance expected of a child without impairments by age group, with one set of skills expected of preschoolers (defined as children from age 3 to the attainment of age 6) and a more advanced set of skills expected of school-age children (defined as children from age 6 to the attainment of age 12). *See, e.g.*, 20 C.F.R. §§ 416.926a(g)(2)(iii), (iv). In any affected domain, the ALJ must consider the interactive and cumulative effects of the child's impairment or multiple impairments. 20 C.F.R. § 416.926a(c). To functionally equal the listings, the child's impairment or combination of impairments must result in "marked" limitations in two or more domains, or an "extreme" limitation in one or more domain. 20 C.F.R. § 416.926a(d).

A child has a "marked" limitation in a domain when his impairment "interferes seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). A child's day-to-day functioning may be seriously limited when the impairment limits only one activity or when the interactive and cumulative effects of the impairment limit several activities. *Id*. A child has an "extreme" limitation in a domain when his impairment

interferes "very seriously" with his ability to independently initiate, sustain, or complete activities. 20 C.F.R § 416.926a(e)(3).

In his findings of fact and conclusions of law, the ALJ began by stating that M.G. was a preschooler when his application was filed and a school-age child at the time of the decision. (R. 13.) In fact, M.G. was seven years old at the time of his application and therefore no longer a preschooler as that term is used in the Act. *See* 20 C.F.R. § 416.926a(g)(2)(iii), (iv).[6]

The ALJ then found, at step one, that M.G. had not engaged in substantial gainful activity since the SSI application was filed, and at step two that M.G. had two severe impairments – ADHD and "learning disorder" – as well as non-severe asthma. (R. 13.) The ALJ found that these impairments were established by the medical evidence in the record and were "severe" because they caused more than minimal limitations in M.G.'s "ability to perform basic work [sic] activities." (R. 13.)[7]

At step three, however, the ALJ concluded that M.G.'s impairments did not meet or medically equal the severity of either of the relevant listed impairments, which he identified as 112.02 (Organic Mental Disorders) and 112.11 (ADHD). 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 13-14.) In determining the degree of limitations with respect to each of the six domains discussed

---

[6] It is not clear to what extent the ALJ's erroneous description of M.G. as a preschooler during a portion of the relevant period influenced his ultimate decision. He never expressly rested his conclusions on M.G.'s age classification. However, in the portion of his decision comparing M.G.'s functioning in the domain of acquiring and using information to that of children without impairments, the ALJ set out – and thus presumably relied in part on – the Social Security rules describing the lesser skills expected of preschoolers. (R. 18.) Similarly, the ALJ set out the preschooler rules (as well as the rules for school-age children) pertaining to attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for self. (R. 19-23.)

[7] This appears to be an error; the regulations for children do not say "work." *See* 20 C.F.R. § 416.924(c) (to be considered "severe," impairments must cause "more than minimal functional limitations").

above, ALJ Kilgannon focused on the hearing testimony given by Gallo and Dr. Burnett. (R. 14-15.) He concluded that Gallo's statements "concerning the intensity, persistence, and limiting effects" of M.G.'s symptoms were "not entirely credible" because, in his view, they were "not consistent" with (a) "her further testimony that she discontinued his prescribed medication due to side effects, and refuses to try any similar medication" and (b) "her further testimony that [M.G.] made some progress with his current placement in a classroom with two teachers and a paraprofessional." (R. 15.) Instead, the ALJ accepted Dr. Burnett's opinion that M.G.'s impairments did not meet or functionally equal the listings because M.G. had "less than marked" limitation in all domains with the exception of Attending and Completing Tasks, where his limitation was "marked." (R. 15.) The ALJ relied both on Dr. Burnett's hearing testimony and on his post-hearing interrogatory answers, to which the ALJ gave "great weight" because Dr. Burnett's opinion was "supported by the evidence of record as a whole, which demonstrates ADHD requiring medication, which the claimant's mother discontinued." (R. 17.)

The ALJ also gave "great weight" to the opinions of consultative examiner Dr. King and state agency consultant Dr. Anderson, both of which he found to be supported by the "evidence of record as a whole." (R. 16-17.) ALJ Kilgannon mentioned the evaluation by M.G.'s treating physician, Dr. Clemente, but did not specify what weight he assigned to it. (R. 15-16.) In discussing Dr. Clemente, the ALJ noted that after Gallo reported the discontinuation of M.G.'s medication to Dr. Moore, Dr. Clemente stated that M.G. "was being treated with medication, but had not yet stabilized." (R. 16.) The ALJ concluded from this timeline that Dr. Clemente "was not aware of [Gallo's] action." (R. 16.)[8]

---

[8] In drawing this conclusion the ALJ may have overlooked or misunderstood the actual sequence of events revealed by the record. Gallo spoke to Dr. Moore on or before November 15, 2012, which was the date of his report. (R. 174.) At that time she had taken M.G. off the Adderall, due to its side effects, and nothing else had been tried. A week later, on November 23, 2012, Dr. Clemente's

Because the ALJ found that M.G. "did not have an impairment or combination of impairments that result in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning," he determined that M.G. was not disabled within the meaning of the Act and had not been disabled since the date of his application. (R. 24.)

## II.   ANALYSIS

The Commissioner contends that this case should be remanded for further proceedings because (1) plaintiff did not receive a full and fair hearing; (2) the ALJ's decision contains legal error; and (3) the ALJ's decision is not based on substantial evidence. I agree that the case should be remanded, though not on every ground advanced by the Commissioner.

### A.   Full and Fair Hearing

Under the Act, a court may set aside a final determination by the Commissioner if it is the result of legal error or is not supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). Before reaching these issues, however, the reviewing court "must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).

"Social Security disability determinations are 'investigatory, or inquisitorial, rather than adversarial.'" *Moran*, 569 F.3d at 112-13 (quoting *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005)). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the

---

colleague, NP Curley, prescribed Concerta for M.G. (R. 181.) It was two weeks after that, on December 5, 2012, that NP Curley and Dr. Clemente stated in a letter that M.G. "was being treated with medication but had not yet stabilized." (R. 178.)

granting of benefits." *Butts*, 388 F.3d at 386 (internal quotation marks and citation omitted). The duty to fully and fairly develop the record exists whether or not the claimant is represented by an attorney, *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir. 1996); however, if an applicant is not represented by counsel, "the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Cruz,* 912 F.2d at 11 (internal quotation marks and citations omitted). Where the applicant is unrepresented and is also a child, "the duty of the administrative law judge is particularly acute." *Colon v. Apfel,* 133 F.Supp. 2d 330, 343 (S.D.N.Y. 2001); *accord Encarnacion ex rel. George v. Barnhart*, 2003 WL 1344903, at *2 (S.D.N.Y. Mar. 19, 2003). In addition, the ALJ's duty to develop the record is "enhanced when the disability in question is a psychiatric impairment," because the Commissioner must be "sensitive to the dynamism of mental illnesses." *Lacava v. Astrue*, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted,* 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012). "If the reviewing court determines that a claimant did not receive a 'fair and adequate hearing' before the ALJ, it must remand the case to the Commissioner." *Watson v. Astrue*, 2009 WL 6371622, at *5 (S.D.N.Y. Feb. 4, 2009) (internal citation omitted), *report and recommendation adopted,* 2010 WL 1645060 (S.D.N.Y. Apr. 22, 2010). *See also Jasmin v. Callahan*, 1998 WL 74290, at *4 (S.D.N.Y. Feb. 20, 1998) (Sotomayor, J.) (if "the claimant has not been given an adequate hearing, the reviewing court should remand even if the original determination is supported by substantial evidence").

Unusually short hearings may indicate insufficient questioning by the ALJ. *See Moran*, 569 F. 3d at 113 (13-page hearing transcript "persuades us that the ALJ . . . failed to give sufficient assistance to [the claimant] in developing the record"); *Thibodeau v. Comm'r of Soc. Sec.*, 339 Fed. App'x 62, 63-64. (2d Cir. 2009) (the "scant administrative record," including 14-page

transcript, required remand for further development); *Cruz*, 912 F.2d at 11-12 (13-page transcript revealed "a host of lost opportunities to explore the facts"); *Hankerson v. Harris*, 636 F.2d 893, 894 (2d Cir. 1980) (remanding where "[t]he hearing was quite brief; the transcript consumes only 16 pages"); *Encarnacion*, 2003 WL 1344903, at *2 (11-page transcript, including four pages of testimony from the claimant's mother and two from minor claimant, showed that hearing was not full and fair); *Straw v. Apfel*, 2001 WL 406184, at *3 (S.D.N.Y. Apr. 20, 2001) (remand based on 10-page transcript, "of which only six or seven [pages] represent actual testimony given by Plaintiff regarding [claimant]").

Regardless of the length of the transcript, a remand is in order if the ALJ has failed to elicit relevant testimony from the claimant or his representative. *See Encarnacion*, 2003 WL 1344903, at *2 (remanding where ALJ failed to elicit any testimony from minor claimant's mother "about the nature of Arlene's psychiatric treatment, nor did he ask about her ADHD or hyperactive behavior"); *Straw*, 2001 WL 406184, at *3 (remanding where ALJ "failed to ask any substantive follow-up questions . . . about Joseph's conditions").

Particularly where the claimant is unrepresented, or a minor, the ALJ must also make an effort to obtain relevant documentary evidence. *See Thibodeau*, 339 Fed. App'x at 63-64 (where pro se claimant lacked documentation concerning his work history, ALJ "should have helped Thibodeau cure that omission"); *Encarnacion*, 2003 WL 1344903, at *2 (ALJ improperly failed to "request the test data and other reports" underlying minor claimant's IEP, and did not seek any information from her current classroom teachers); *Straw*, 2001 WL 406184, at *3 (ALJ failed to request IEP-related test data or "seek information from Joseph's classroom teachers, although that information would have been helpful to assess Joseph's abilities in the area of concentration, persistence or pace").

It is also important for the ALJ to seek (or assist a pro se plaintiff to seek) a full report from the claimant's treating physician. *See Hankerson*, 636 F.2d at 896 (remanding where ALJ failed to "advise plaintiff that he should obtain a more detailed statement from his treating physician"); *Price ex rel. A.N. v. Astrue*, 42 F. Supp. 3d 423, 433 (E.D.N.Y. 2014) (remanding where ALJ denied application without obtaining opinions or records from treating doctor and psychiatrist); *Straw*, 2001 WL 406184, at *3 (ALJ failed to provide a full and fair hearing where, *inter alia*, he failed to seek information or report from claimant's treating psychologist); *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) ("the ALJ was required to develop [claimant's] complete medical history for at least a twelve-month period if there was reason to believe that the information was necessary to reach a decision"). In making any determination, the ALJ shall make "every reasonable effort" to obtain from the individual's treating physician (or other treating "medical source") all medical evidence necessary to properly make a determination, prior to requesting medical evidence from any other source on a consultative basis. 20 C.F.R. § 416.912 (e).

"The duty to develop the record goes hand in hand with the treating physician rule, which requires the ALJ to give special deference to the opinion of a claimant's treating physician." *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004). Thus, the ALJ may not "discredit" the opinion of a treating physician without "affirmatively seek[ing] out clarifying information from the doctor." *Lacava*, 2012 WL 6621731, at *12 (quoting *Duncan v. Astrue,* 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011)).

### a.      The Hearing Was Very Short

Here, the transcript is 13 pages long. Two pages reflect the ALJ's opening colloquy with Gallo (during which he confirmed that she did not want to postpone the hearing in order to make another attempt to secure counsel), and another two pages are taken up with the process of telephoning the medical expert and placing the witnesses under oath. (R. 31-33, 34-36.) Thereafter,

the transcript contains a total of 52 lines of speech by Gallo (approximately two pages in the aggregate), including her two attempts to explain that she did not understand Dr. Burnett's testimony.

The first such attempt came as Dr. Burnett was giving his opinion concerning M.G.'s ability to acquire and use information (which he simply referred to as "domain number one"):

> Q.   And, doctor, could you please provide the rationale and support for your opinion?
>
> A.   I believe under domain number one, there was less than marked evidence. Under document 5F, there was evidence both from – and also under 4E, there was evidence of less-than-marked criterion, both by the teacher's statement under 5F, light [sic] to obvious notation in her document that were consistent with that designation.
>
> WTN:  What is he talking about?
>
> BY THE ADMINISTRATIVE LAW JUDGE:
>
> Q.   And could you proceed with the other domains, doctor? You gave an opinion on acquiring using [sic] information. What about attending and completing tasks, doctor?

(R. 40-41.) After the ALJ took Dr. Burnett through the remaining domains – eliciting similarly terse answers, in which the expert almost exclusively referred to issues and documents in shorthand, using numbers and letters – he asked Gallo if she had any questions for Dr. Burnett, "or if there is anything else you want to tell us before we close the record." (R. 42.) Once again Gallo tried to explain her confusion: "For the doctor? I don't exactly know what he is reading and talking about right now, just that he needs help, my son." *Id*. The ALJ replied that he would "take all of that into account" and would issue a written decision. (R. 43.)

### b.   The ALJ Made No Effort to Help the Plaintiff Understand the Issues And Failed To Elicit Relevant Testimony

The ALJ never made any effort to help Gallo understand either the substance or the significance of the medical expert's testimony. He did not ask Dr. Burnett to use language that a

layperson might understand. Nor did he identify the portions of the record on which the doctor relied (which Dr. Burnett himself referred to only by their administrative record numbers), in a manner that might enable her to follow along, even though Gallo told him plainly that she did not know "what [Dr. Burnett] is reading and talking about." (R. 42.) Moreover, the ALJ did not elicit any testimony from Gallo other than prompting her to tell Dr. Burnett about her decision to discontinue M.G.'s medication. He did not ask any questions about her son's current level of functioning, either at home or at school. He did not inquire about M.G.'s symptoms, did not follow up on her statement that M.G. was "making a bit of progress" in his third grade ICT class (R. 39), and did not show any interest in M.G.'s academic performance. Further, with regard to Gallo's decision to discontinue her son's medication, the ALJ never asked her whether she saw any improvement in his ADHD symptoms while he was on the medication, or what the "unbearable" side effects were that caused her to discontinue medication therapy. (R. 37.) He did not even ask how long M.G. took each medication before it was discontinued. The ALJ also failed to ask her why M.G. himself was not present at the hearing and whether she would like the boy to testify. *Cf. Encarnacion*, 2003 WL 1344903, at *2 (child diagnosed with ADHD testified at SSI hearing about her difficulty in paying attention). In short, "[t]he record is replete with instances where the ALJ should have questioned plaintiff more fully." *Hankerson*, 636 F.2d at 895.

### c.   The ALJ Made No Effort To Obtain Relevant Documentary Evidence

ALJ Kilgannon also failed to obtain (or even inquire about) numerous documents that might have been in the record but were not. For example, although Gallo testified that M.G. had an IEP (R. 39), the ALJ did not ask to see it, nor any of the testing or evaluation on which it was based, nor any of M.G.'s progress reports for the past year. Similarly, the ALJ did not ask for M.G.'s report cards, nor seek any updated information from his classroom teachers. These

documents would have been highly relevant to the ALJ's decision. *See Encarnacion*, 2003 WL 1344903, at \*2; *Straw*, 2001 WL 406184, at \*3.

The ALJ also erred in failing to obtain (or even inquire about) more complete records from M.G.'s treating physician. *See Hankerson*, 636 F.2d at 896. Although Dr. Clemente's April 5, 2012 treatment notes and report were in the record (R. 179-87), the SSI hearing took place almost two years later – a significant period of time in the life of an 8-year-old boy – and the only evidence regarding his treatment during that period consisted of a photocopied prescription and two short notes, the latest one dated March 20, 2013. (R. 178, 181, 194.) The ALJ did not inquire as to M.G.'s course of treatment over the past year, did not ask for recent treatment notes, did not suggest that Dr. Clemente prepare an updated report, and did not ask whether Dr. Clemente was willing to testify. "Remand is appropriate when the ALJ neglects to pursue information that would fill gaps in the record." *Rodriguez v. Astrue*, 2009 WL 637154, at \*18 (S.D.N.Y. Mar. 9, 2009).

The ALJ's failure to obtain more information from Dr. Clemente is especially troubling in light of his decision to give "great weight" to the opinions of various consultative experts – who saw M.G. only once or not at all – while discounting Dr. Clemente's 2012 report and suggesting that he was not fully informed concerning M.G.'s later treatment and progress. (R. 16-17.) The ALJ thus failed to "ensure[ ] that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions." *Lacava*, 2012 WL 6621731, at \*13.

### d.    The ALJ Relied on Post-Hearing Interrogatory Answers

"[T]he Second Circuit 'has long held that the Commissioner cannot base a disability decision upon a report obtained after the hearing unless the claimant has been permitted to confront the new evidence.'" *Duran v. Barnhart*, 2003 WL 103003, at \*8 (S.D.N.Y. Jan. 13, 2003) (quoting *Jasmin*, 1998 WL 74290, at \*5). *See also Townley v. Heckler*, 748 F.2d 109, 114 (2d Cir. 1984) (due process was violated when ALJ relied on post-hearing report). Here, ALJ Kilgannon

expressly relied upon interrogatory answers that he requested and received from Dr. Burnett after the close of the hearing. (R. 199, 226.) The ALJ did not advise Gallo that he would seek additional material from Dr. Burnett and did not offer her an opportunity to respond. It is not even clear from the record whether Gallo saw the questions, or the answers, until the appeal record was prepared. *See Duran*, 2003 WL 103003, at *8 (where record was "silent" as to whether ALJ proffered post-hearing report to claimant, "the only reasonable inference" is "that she was not given the opportunity to examine this evidence, let alone rebut its content").

The Social Security Administration's Hearings, Appeals, and Litigation manual (HALLEX), which sets forth safeguards and procedures for the agency's administrative proceedings, requires an ALJ to "proffer" post-hearing interrogatory responses to the claimant, that is, to give her an opportunity to review the new evidence, comment on it, object to it, attempt to refute it by offering other evidence, and, "if required for a full and true disclosure of the facts," to "cross-examine the author(s) of the [new] evidence." HALLEX I-2-7-1. I recognize that HALLEX is "simply a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner," and therefore that a failure to follow HALLEX does not necessarily constitute legal error. *Harper v. Comm'r of Soc. Sec.*, 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010). *See also Dority v. Comm'r of Soc. Sec.*, 2015 WL 5919947, at *5 (N.D.N.Y. Oct. 9, 2015) ("The Second Circuit has not yet determined whether or not HALLEX policies are binding; however, other Circuits and district courts within the Second Circuit have found that 'HALLEX policies are not regulations and therefore not deserving of controlling weight.'") (quoting *Edwards v. Astrue*, 2011 WL 3490024, at *6 (D. Conn. Aug. 10, 2011)). However, HALLEX often "provides a helpful guideline," *Dority*, 2015 WL 5919947, at *5, and in this case it underscores my conclusion that the ALJ erred by seeking and obtaining post-hearing opinion evidence – which he then assigned

"great weight" in his decision – without giving the unrepresented claimant any opportunity to review, respond to, or rebut the new evidence.

### e.        Plaintiff Did Not Receive a Full and Fair Hearing

"While none of these errors standing alone might be sufficient to set aside the Secretary's determination," *Hankerson*, 636 F.2d at 897, taken in combination, they persuade me that the ALJ "failed to fulfill h[is] duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Straw*, 2001 WL 406184, at *3. Moreover, by moving for a remand, the Commissioner recognizes the flaws in the process afforded by the agency. For this reason I respectfully recommend that the District Judge grant the Commissioner's motion and remand for a new hearing and decision pursuant to the fourth sentence of 42 U.S.C. § 405(g).

### B.        Legal Error

According to the Commissioner, the ALJ committed legal error at step three by failing to apply a "Psychiatric Review Technique" (PRT), which, where applicable, "requires the ALJ to conduct certain additional evaluations and make corresponding findings and conclusions when considering the severity" of a claimant's mental impairments. *Miller v. Comm'r of Soc. Sec.*, 409 Fed. App'x 384, 387 (2d Cir. 2010); *see also Kohler v. Astrue*, 546 F.3d 260, 267-69 (2d Cir. 2008)). However, the relevant regulations specify that the PRT is confined to the evaluation of "the severity of mental impairments for adults . . . and in persons under age 18 when Part A of the Listing of Impairments is used." 20 C.F.R. § 416.920a. Because M.G. was under the age of 18 at the time plaintiff applied for SSI benefits, and because he does not claim benefits as the result of an impairment enumerated in Part A of the listings (which covers adult impairments), the ALJ committed no error by evaluating the claim pursuant to 20 C.F.R. § 416.924, *et seq.* instead of applying the PRT. *Miller*, 409 Fed. App'x at 387.

The ALJ did err by assuming that M.G. was a preschooler at the time of his SSI application (R. 13), when in fact he was seven years old at that time, making him a school-age child for purposes of the Act. *See* 20 C.F.R. § 416.926a(g)(2)(iv). Because this error may have affected the ALJ's analysis of M.G.'s performance in five of the six domains (R. 18-23), it would require a remand even if the plaintiff had been afforded a full and fair hearing. I therefore respectfully recommend that the District Judge remand for a new hearing and decision on this ground as well.

### C.      Substantial Evidence

In addition to conducting an inadequate hearing, the ALJ failed to provide sufficient support for the findings in his written decision. The treating physician rule requires the ALJ to give controlling weight to the opinion of a claimant's treating physician, as long as that opinion is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). The rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2). *See also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

Where mental health treatment is at issue, the treating physician rule takes on added importance. *Rodriguez*, 2009 WL 637154, at *26. "A mental health patient may have good days and bad days; [he] may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and [his] treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily

achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at *9

(S.D.N.Y. Dec. 14, 2015). *See also Richardson v. Astrue,* 2009 WL 4793994, at *7 (S.D.N.Y. Dec.

14, 2009) ("Because mental disabilities are difficult to diagnose without subjective, in-person

examination, the treating physician rule is particularly important in the context of mental health.")

(internal citations and quotation marks omitted).

> In this Circuit, the treating physician rule is robust.

> Before an ALJ can give a treating physician's opinion less than controlling weight,
> the ALJ must apply various factors to determine the amount of weight the opinion
> should be given. These factors include: (1) the length of the treatment relationship
> and the frequency of examination, (2) the nature and extent of the treatment
> relationship, (3) the medical support for the treating physician's opinion, (4) the
> consistency of the opinion with the record as a whole, (5) the physician's level of
> specialization in the area and (6) other factors that tend to support or contradict the
> opinion.

*Norman v. Astrue*, 912 F. Supp. 2d 33, 73 (S.D.N.Y. 2012); *see also* 20 C.F.R. § 416.927(c)(2)

(listing factors). Assuming a sufficiently lengthy doctor-patient relationship with adequate

opportunities for examination, the ALJ can discount the treating physician's opinion only if the

ALJ believes that it "lack[s] support or [is] internally inconsistent." *Duncan*, 2011 WL 1748549,

at *19. "When other substantial evidence in the record conflicts with the treating physician's

opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion

is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133

(2d Cir. 1999).

"[I]n order to accommodate 'limited and meaningful' review by a district court, the ALJ

must clearly state the legal rules he applies and the weight he accords the evidence considered."

*Rivera v. Astrue*, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted). *See also*

20 C.F.R. § 416.927(c)(2) (the Commissioner "will always give good reasons in our . . . decision

for the weight we give your treating source's opinion"). Particularly where an ALJ does not credit

a treating physician's findings, the claimant is entitled to an explanation. *Snell*, 177 F.3d at 134 (administrative decisionmakers must "explain why a treating physician's opinions are not being credited"). An ALJ who fails to provide an adequate roadmap for his reasoning deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence; in these cases, remand is appropriate. *Snell*, 177 F.3d at 134; *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

Here, the ALJ gave "great weight" to the opinions of consultative psychiatric examiner Dr. King, state agency consultant Dr. Anderson, and medical expert Dr. Burnett, but paid no such deference to treating physician Dr. Clemente. (R. 16-17.) Dr. King examined M.G. once, while Dr. Anderson and Dr. Burnett based their opinions on a review of M.G.'s file. With respect to each of these opinions the ALJ stated that it deserved great weight because it was "supported by the evidence of record" (R. 16) or "supported by the evidence of record as a whole." (R. 17.) The ALJ did not identify any specific evidence that caused him to accept these experts' opinions, and apparently did not notice that Dr. Burnett's opinion was based on his erroneous assumption – for which there is no support in the record – that M.G.'s condition "improved with meds." (R. 230.)[9]

Nor did the ALJ explain why he gave such apparently short shrift to Dr. Clemente's findings, except to note that "it appears that treating developmental/behavioral pediatrician Dr. Clemente was not aware of [Gallo's] action [discontinuing M.G.'s medication due to side effects], as he stated that the claimant was being treated with medication, but had not yet stabilized." (R. 16.) Assuming without deciding that such a lack of awareness could be a "factor" that would "tend to support or contradict" a treating physician's views, *Norman*, 912 F. Supp. 2d at 73, in this case the record does not validate the ALJ's conclusion. As noted above, SIUH put M.G. on Concerta

---

[9] Nor did he notice that inconsistency between Dr. Burnett's opinion and Dr. King's report, which noted that medication therapy "had not been successful. (R. 171.)

*after* Gallo told Dr. Moore that she had discontinued his Adderall therapy and *before* Dr. Clemente wrote that he was being treated with medication but had not stabilized. (R. 175, 181, 178.) To the extent the ALJ required more clarity as to when each medication was tried and when it was stopped, he could and should have asked Gallo those questions at the hearing or obtained the relevant information from M.G.'s treating physician.

Because the ALJ failed to specify the record evidence that caused him to give "great weight" to the consulting experts, failed to notice that Dr. Burnett's opinion was based on a significant factual assumption for which there is no support in the record, failed to specify what weight he gave to Dr. Clemente's report, and failed to specify any record-based factors that tended to contradict Dr. Clemente's views, I conclude that the decision below is not supported by substantial evidence and respectfully recommend that the District Judge remand it on this ground as well.

## CONCLUSION

For all of the reasons stated above, I respectfully recommend that this action be REMANDED for a new hearing and determination pursuant to the fourth sentence of 42 U.S.C. § 405(g). In light of M.G.'s age, and the time that has already elapsed since his mother applied for benefits in 2012, "[f]urther proceedings on remand should be promptly dispatched." *Montano v. Barnhart*, 2003 WL 749527, at *6 (S.D.N.Y. Mar. 5, 2003).

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a), (d). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections must be filed with the Clerk

of the Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Torres. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to the plaintiff.

Dated: New York, New York
          December 23, 2016

**SO ORDERED**.

_____
**BARBARA MOSES**
**United States Magistrate Judge**